**Opinion issued June 26, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00503-CR

————————————

**LETOUSHA MARSHALL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 1790919**

---

## MEMORANDUM OPINION

A jury convicted Letousha Marshall of first-degree murder for the shooting death of her boyfriend and sentenced her to fifty years' confinement. *See* TEX. PENAL CODE § 19.01(b)(1)–(2), (c). In five issues on appeal, Marshall contends that the evidence was insufficient to disprove self-defense, the self-defense portion of the

jury charge contained multiple errors, and the cumulative effect of these charge errors rendered the trial fundamentally unfair. We affirm.

## Background

Just before 7 p.m. on October 10, 2018, several residents at the Little Canfield apartment complex in north Houston called 911 and reported a shooting in an outdoor area. Police and paramedics arrived shortly after the shooting, and paramedics pronounced Samuel Earl Edmon dead.[1] A single bullet went through the back of his arm, into his back, and upward into his chest, where it pierced a lung and his heart.

Marshall approached one of the first responding police officers and reported her involvement in the shooting. She also gave police a .380 handgun that she used in the shooting. She then went to the police station to give a voluntary statement. She was driven to the station in a Houston Police Department police cruiser, and HPD policy required that she be handcuffed even though she was not under arrest. Before cuffing her, police put bags over her hands to later test them for gunshot residue. Testing determined that gunshot residue was present on her hands.

HPD Detectives John Stroble and Michael Barrow were assigned to investigate Edmon's death. They arrived at the Little Canfield apartment complex

---

[1]    Edmon was known by the nickname "Killa," and much of the trial evidence referred to him by this nickname.

2

within two hours of the shooting. Detective Barrow and a crime scene unit processed the scene by searching for physical evidence and attempting to speak to witnesses. Detective Stroble took Marshall to the police station to interview her.

At the police station, Marshall gave a videotaped voluntary statement.[2] A recording of her statement was admitted into evidence at trial and played for the jury.

Marshall said that she and Edmon had been dating for approximately two months, but they recently had been arguing over Edmon's accusations that she was flirting with other men. Edmon had a temper, and people had told her to end the relationship because he was crazy and would kill her. Marshall said that they argued the night before the shooting, and she ended the relationship because Edmon would "go off on [her] every day." But she said they were fine on the day of the shooting.

Marshall said that on that day, she was visiting friends at an outside area of the Little Canfield apartments. Marshall did not live at the apartment complex, but she lived nearby. Edmon and his cousin Lawrence Taylor approached. Edmon "started going off" saying, "I'm a real gangster, I'm a real thug, I know how to be a real killer, why you think they call me a Killa?" Marshall could not calm Edmon down, and her son soon arrived to speak to Edmon. Marshall then left the complex

---

[2]    Marshall gave two statements to police: one on the night of the shooting and another a few days later. Both statements were videotaped and shown to the jury at trial. Unless otherwise noted, we refer to these statements as a singular statement for ease of reading.

to walk to a nearby convenience store. She carried a firearm as she usually did for her safety while walking in the area.

When Marshall returned to the Little Canfield apartments, she said she heard two gunshots. The first shot did not concern her because she often heard gunfire in the area. But she perceived the second shot as a warning shot directed at her. She looked to see where the shots came from, and she saw Edmon peeking out from behind a wall and holding a gun. Marshall turned and ducked for cover between cars and fired once over her shoulder towards Edmon as she did so. After she fired at Edmon, Taylor began shooting at her. She said that Taylor was standing across the parking lot from Edmon. She fired back at Taylor but did not hit him. She told police that she fired three rounds total, and Taylor was "letting them off."

The shooting did not last long. Edmon and Taylor ran off. Marshall ran to a friend's apartment, but the friend did not want Marshall there after the shooting. Marshall then went to her friend Rosetta Terrell's apartment at Little Canfield. She said police arrived "pretty quick," and she approached them to report her involvement.

While Marshall gave her statement at the police station, Detective Barrow searched for evidence and spoke to witnesses at the Little Canfield apartments. Police did not find a gun on Edmon, and there was no evidence he had a gun or fired one. Edmon's hands also tested negative for gunshot residue. Police only found two

cartridge casings: a .380 casing that testing later determined was fired from Marshall's gun, and a 9-millimeter casing that testing later determined was fired from Taylor's gun. This information was relayed back to Stroble as he interviewed Marshall at the police station. Marshall mentioned that residents might have picked up other casings or Edmon's gun before police arrived.

Many witnesses were uncooperative with police. But one witness testified that he heard a gunshot and looked out the window of his apartment. He saw a tall woman with dyed blond hair walking with a limping man, and the woman had a gun.

Rosetta Terrell testified that it seemed like Marshall wanted to be in a relationship with Edmon more than he did. She also testified that she saw Marshall before the shooting. Marshall was "mad." She asked where Edmon was and said, "I'm about to shoot him." Terrell told Edmon about Marshall's threats, but he brushed them off. Soon after, Terrell saw Marshall walking down the sidewalk, "heard her mouth, and then [Terrell] heard gunshots." Terrell saw Edmon on the other side of the street, but she did not see him with a gun. Taylor then began shooting at Marshall. Terrell ran back to her apartment at Little Canfield, and Marshall approached soon after. Marshall asked Terrell if Edmon was alright and claimed to not know whether he was shot.

Police spoke to Taylor the day after the shooting. Barrow testified that Taylor was cooperative and provided a statement. He turned over the 9-millimeter handgun

he used during the shooting, and police confirmed that one of the casings found at the shooting scene was fired from this gun. Although Taylor shot at Marshall, Barrow and Stroble ultimately believed that his conduct was justified in self-defense, and Taylor was not charged for his role in the shooting.

Marshall was arrested within days of the shooting. Police obtained a search warrant and searched her two cell phones. The phones contained a bus ticket to New Orleans departing two days after the shooting. They also contained a text message sent from Marshall's phone stating, "I'm good he kept fuccn with me for like two weeks I kept telling him I didn't play he said you ain't no killa you ain't going to do shit[.]"

A grand jury indicted Marshall for first-degree murder. She pleaded not guilty.

Numerous witnesses testified at trial. One of the first officers to respond to reports of the shooting testified that Marshall approached him, reported her involvement, and handed over her firearm. The officer testified that Edmon was dead when he arrived. Detectives Stroble and Barrow testified about their investigation and Marshall's statement to police. Stroble testified that it was not plausible for the bullet to hit Edmon in the back based on Marshall's description of the shooting. Stroble also testified that the witnesses who would talk gave consistent statements, but they did not corroborate Marshall. Stroble also testified that he learned Edmon had another girlfriend. Finally, Stroble testified that the .380 casing that was fired

6

from Marshall's gun was found "very far" from where Marshall claimed she was standing when she shot Edmon.

A crime scene investigator testified about collecting evidence, and numerous photographs she took of the scene were admitted into evidence. A firearms examiner confirmed that testing of the two cartridge casings revealed that one was fired from Marshall's .380 firearm, and the other was fired from Taylor's 9-millimeter firearm. His reports were admitted into evidence. A trace evidence analyst testified that gunshot residue was found on Marshall's hands but not on Edmon's hands, and his reports were admitted into evidence. A digital forensic analyst testified about the bus ticket and text message found on Marshall's phone, and images of these items were admitted into evidence.

An autopsy report was also admitted into evidence. A medical examiner who reviewed the report testified that Edmon was killed by a single gunshot wound. The bullet went through the back of his left arm, into his back, and upward into his chest, where it perforated his lower left lung and heart.

Three Little Canfield residents, including Terrell, also testified. Taylor did not appear or testify at trial even though he was subpoenaed and the trial court issued a writ of attachment. Marshall did not testify, but the video recordings from her statement to police were admitted at trial and played for the jury. Her primary trial defense was that she killed Edmon in self-defense. The State argued that the killing

was not justified because the evidence showed Marshall was angry with Edmon and shot him once in the back.

After the close of evidence, the trial court held a jury charge conference. The court asked if there were "[a]ny objections or requested instructions from the defendant[.]" Defense counsel responded, "No, Your Honor." The charge submitted to the jury included instructions on the laws of murder and self-defense. The jury found Marshall guilty of murder and sentenced her to fifty years' imprisonment. This appeal followed.

### Sufficiency of the Evidence on Jury's Rejection of Self-Defense

In her first issue, Marshall contends that the evidence was legally insufficient to disprove self-defense beyond a reasonable doubt.

### A. Standard of Review and Governing Law

Due Process requires that a conviction be supported by legally sufficient evidence. *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)). In conducting a legal sufficiency review, we "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

As the factfinder, the jury is "the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Id.* at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). We presume that the jury resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Id.* The jury's choice between two permissible views of the evidence is not clearly erroneous. *Id.* (quotations omitted). Juries may not, however, reach conclusions based on "mere speculation or factually unsupported inferences or presumptions." *Id.* (quoting *Hooper*, 214 S.W.3d at 15–16).

A person commits murder if the person intentionally or knowingly causes the death of an individual, or if the person intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1)–(2); *see id.* § 6.03(a)–(b) (defining intentional and knowing conduct). Deadly force used in self-defense is a defense to prosecution for murder if that use of force is "justified." *Braughton*, 569 S.W.3d at 606 (quoting TEX. PENAL CODE § 9.02). The Penal Code provides that "[a] person is justified in using deadly force against another: (1) if the actor would be justified in using force against the other under Section 9.31; and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary" to protect the actor against the other's use or attempted use of unlawful deadly force or to prevent the

other's commission of certain violent offenses, including murder. TEX. PENAL CODE § 9.32(a).

Under the first prong, an actor is justified in using force against another under section 9.31, with certain exceptions, "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Use of force against another is not justified in response to verbal provocation alone or if the actor provoked the other's use or attempted use of unlawful force. *Id.* § 9.31(b)(1), (4).

The second prong—whether the actor's belief was reasonable—contains subjective and objective components. *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). The actor must subjectively believe that another person used or attempted to use unlawful or deadly force against her and that the actor's use of deadly force in response was immediately necessary. *Id.* The actor's belief must also be reasonable: A reasonable belief is a belief held "by an ordinary and prudent man in the same circumstances as the actor." *Id.* (quoting TEX. PENAL CODE § 1.07(a)(42)). A statutory presumption of reasonableness arises if the actor: (1) knew or had reason to believe that the person against whom the deadly force was used was engaging in certain criminal activity, including the commission of a violent offense like attempting to commit murder; (2) did not provoke the person against

whom the force was used; and (3) was not otherwise engaged in criminal activity other than a Class C misdemeanor. TEX. PENAL CODE § 9.32(b).

To raise a claim of self-defense, a defendant has the burden to produce evidence supporting the defense. *Braughton*, 569 S.W.3d at 608. The defendant meets this burden by adducing some evidence that would support a rational finding in her favor on the defensive issue. *Id.*

The State, by contrast, has the burden of persuasion to disprove the raised issues. *Id.* The State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Id.* (quotation omitted).

In conducting an evidentiary sufficiency review in a case where the defendant raised self-defense, we do not consider "whether the State presented evidence which refuted appellant's self-defense testimony." *Id.* at 609 (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). Rather, "we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Id.* (quoting *Saxton*, 804 S.W.2d at 914). Self-defense is an issue of fact to be determined by the jury. *Id.* A jury's guilty verdict

11

"is an implicit finding rejecting the defendant's self-defense theory." *Id.* (quoting *Saxton*, 804 S.W.2d at 914).

**B.    Analysis**

Marshall does not dispute that the State's evidence was sufficient to establish the essential elements of murder beyond a reasonable doubt. *See id.*; TEX. PENAL CODE § 19.02(b). Instead, she challenges the evidence supporting the jury's rejection of self-defense. *See Braughton*, 569 S.W.3d at 609. She argues that the State's evidence rebutting self-defense was speculative, and no witness testified about what happened.[3] She also argues that two particular items of evidence were "not sufficient to prove that in the moment the shootout began that she was not acting in self-defense."[4] This evidence is (1) a witness's testimony that prior to the shooting, Marshall arrived at the apartment complex and said "Where's Killa [Edmon]? I'm about to shoot him."; and (2) a text message sent from Marshall's phone stating, "I'm good he kept fuccn with me for like two weeks I kept telling him I didn't play he said you ain't no killa you ain't going to do shit[.]"

---

[3]    Marshall also argues that she was entitled to a presumption of reasonableness under section 9.32(b) on whether she reasonably believed that deadly force was immediately necessary to defend herself. We discuss and reject this argument below.

[4]    In Marshall's second statement to police, Detective Stroble told her that multiple people may have contradicted her version of events. Marshall contends that Stroble's statement was not true but was instead used as an interrogation tactic, and she thus argues that his statement is insufficient to disprove self-defense. This statement is not pertinent to our analysis.

12

To raise self-defense, Marshall had the burden to produce some evidence that would support a rational finding in her favor on the issue. *See id.* at 608. Her theory relied almost solely on her voluntary statements to police. In video recordings admitted at trial, Marshall told police that on the day of the shooting, she was visiting some friends in an outside area at the Little Canfield apartment complex. Edmon and his cousin Taylor arrived. Marshall and Edmon were dating, but Marshall said she had ended the relationship the night before. Marshal said that when Edmon arrived, he "started going off" and saying, "I'm a real gangster, I'm a real thug, I know how to be a real killer, why you think they call me a Killa?"

Marshall briefly left the complex to go to a nearby convenience store, and she carried a firearm with her as she usually did when walking in the area for her safety. When she returned to the Little Canfield apartments, she heard two gunshots and perceived the second shot as a warning shot directed at her. She saw Edmon standing partially behind a wall and holding a gun. She turned and ducked for cover between some cars, and as she did so, she fired once at Edmon over her shoulder. Taylor then fired several shots at her from his location across a parking lot from Edmon, and she shot back at Taylor. She told police that she shot three rounds and that Taylor was "letting them off." When the shooting stopped, Marshall ran to Terrell's apartment and told Terrell that she did not know whether Edmon was shot.

Police quickly arrived at the Little Canfield apartments in response to several 911 calls. Marshall approached one of the first responding officers and reported her involvement in the shooting. She gave the officer the .380 handgun she used in the shooting and went to the police station where she gave a statement. Because some evidence supported Marshall's self-defense theory, the State bore the burden of persuasion to disprove the defense. *Id.* at 608–09.

The State presented a competing version of the shooting. *See id.* at 609 (stating that reviewing court does not consider whether State presented evidence refuting defendant's self-defense testimony). Police did not find any evidence that Edmon had a gun or shot at Marshall, and Terrell testified that she did not see Edmon with a gun when she heard the gunshots. Police did not find a gun on him, and his hands tested negative for the presence of gunshot residue. Police found only two cartridge casings, a .380 casing fired from Marshall's gun and a 9-millimeter casing fired from Taylor's gun. Police found the .380 casing "very far" from the location where Marshall claimed she was standing when she shot at Edmon.

A medical examiner testified that the bullet travelled "back to front, and upward" through Edmon's body. It went through the back of his arm and lodged into his chest. Detective Stroble also testified that it was not plausible for the bullet to hit Edmon in the back based on Marshall's version of the shooting. Detectives Barrow

and Stroble testified that they spoke to Taylor—who did not appear at trial—and determined that he was justified in shooting at Marshall.

Other evidence showed that Marshall and Edmon had been arguing, Edmon had anger issues, Marshall had been told by other people that Edmon would kill her, their relationship may have been concluding, and Edmon may have had another girlfriend. Terrell testified that Marshall wanted to be in a relationship with Edmon more than he did.

This evidence is not speculative, and Marshall's sufficiency arguments do not address it. It supports the State's theory that Marshall shot Edmon in the back while he was unarmed, calling into doubt her statement that she shot Edmon in self-defense only after Edmon shot at her first.

Marshall disputes some of the physical evidence found at the scene, arguing that people could have picked up some of the other cartridge casings and Edmon's gun, which is consistent with her statements that she and Taylor fired more shots than indicated by the two casings found at the scene. But self-defense is a fact issue to be determined by the jury. *Id.* "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id.* (quoting *Saxton*, 804 S.W.2d at 914).

15

Furthermore, as Marshall points out, a witness testified that before the shooting, Marshall asked "Where's Killa [Edmon] at?" and said, "I'm about to shoot him." A text message sent from Marshall's phone stated, "I'm good he kept fuccn with me for like two weeks I kept telling him I didn't play he said you ain't no killa you ain't going to do shit[.]" Marshall is correct that these statements do not necessarily disprove that she was acting in self-defense at the time of the shooting. But this was a fact issue for the jury to decide. *Id.*

In short, the jury was presented with two competing narratives: one in which Marshall shot Edmon in self-defense after he shot at her, and another in which she shot Edmon from behind while he was unarmed. To resolve the competing versions, the jury was required to weigh the evidence and determine the witnesses' credibility, and we defer to the jury's resolution. *See id.* A rational jury could have disbelieved Marshall, believed the State's evidence, and reasonably concluded beyond a reasonable doubt that Marshall was not justified in using deadly force against Edmon. *See id.* We therefore hold that the evidence was legally sufficient to support the judgment of conviction.

We overrule Marshall's first issue.

**Jury Charge**

In her second through fifth issues, Marshall contends that the self-defense portion of the jury charge contained multiple errors, which were harmful alone and

16

in their cumulative effect. Marshall acknowledges that she did not object to the jury charge when the trial court presented it to the parties before closing arguments.

## A.     Standard of Review and Governing Law

The trial court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. Jury instructions inform the jury of the applicable law and how to apply it to the facts adduced at trial. *Alcoser v. State*, 663 S.W.3d 160, 164–65 (Tex. Crim. App. 2022).

Appellate courts analyze claims of jury charge error in two steps under the *Almanza* framework. *See id.* at 165 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). First, we determine whether the charge contained error, regardless of whether the error was preserved. *Id.* In reviewing for error, we must examine the charge as a whole instead of as a series of isolated and unrelated statements. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). If error exists, we then determine whether the error harmed the defendant. *Alcoser*, 663 S.W.3d at 165; *see Hutch v. State*, 922 S.W.2d 166, 174 (Tex. Crim. App. 1996) ("A defendant is entitled to be convicted upon a correct statement of the law.").

Where, as here, the defendant did not object to the alleged jury charge error in the trial court, the defendant must demonstrate that any error caused "egregious harm." *Alcoser*, 663 S.W.3d at 165 (quotation omitted). To assess harm, we consider (1) the entire jury charge; (2) the state of the evidence, including the contested issues

17

and weight of the probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Id.* (quotation omitted).

A finding of egregious harm must be based on actual harm rather than theoretical harm. *Id.* (quotation omitted). Egregious harm is a difficult standard to meet, and the analysis is fact-specific. *Id.* Jury charge error causes egregious harm if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory. *Id.* Neither party has the burden to show harm. *Id.*

**B.     Preservation of Error**

We first address the State's argument that Marshall did not preserve error on her second and third issues. These issues concern complaints that the jury charge omitted instructions on multiple assailants and the presumption of reasonableness. The State argues that these omissions concern defensive issues, Marshall did not request these instructions or object to their omission from the charge, and therefore these issues were not preserved and are not reviewable under the *Almanza* framework. In her reply brief, Marshall disputes that she waived these complaints.

The State's preservation argument relies on *Posey v. State*, which held that "a defensive issue is not '[the law] applicable to the case' for purposes of Article 36.14 unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge." 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). The court acknowledged that this holding might conflict with the *Almanza* framework for

18

review of jury charge error, but it construed *Almanza* as applying to "omissions of issues upon which a trial court has a duty to instruct without a request from either party or issues that have been timely brought to the trial court's attention." *Id.* at 63–64. The court also stated that requiring an objection comports with the mandate in article 36.14 that a defendant must object to claimed errors of commission and omission in the jury charge. *Id.* at 63.

But in a subsequent decision, the court limited *Posey* to an omitted instruction on a defensive issue that the defendant neither requested nor objected to its omission. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). When instead the jury is charged on a defensive issue, any flaw in that charge is error subject to review under *Almanza*. *Id.* If the defendant did not request the charged defensive issue, any error is reversible if it caused egregious harm. *Id.* The court has also stated that "a defendant is entitled to an instruction on any defensive issue that is raised by the evidence" regardless of its strength or credibility. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020).

Although it is true that Marshall did not request self-defense instructions or object to the jury charge that she now challenges on appeal, the trial court nevertheless included instructions on self-defense in the charge. *See id.* Marshall's jury charge challenges focus on the self-defense portion of the instructions. We construe her second and third issues as challenging the correctness of the self-

defense instructions, and therefore these issues are subject to review under *Almanza*. *See Vega*, 394 S.W.3d at 519. We hold that Marshall did not waive her second and third issues.

## C. Multiple-Assailants Instruction

In her second issue, Marshall contends that the self-defense portion of the charge erroneously omitted instructions and an application paragraph on multiple assailants. She argues that she was entitled to these instructions because there was evidence showing Edmon and Taylor shot at her, and a third unidentified person was seen carrying a gun. Therefore, she would have been justified in shooting Edmon based on a reasonable fear of serious bodily harm from multiple people acting together. *See Jordan*, 593 S.W.3d at 344 (stating that multiple-assailants charge is proper if evidence shows "defendant had a reasonable fear of serious bodily injury from a group of people acting together").

As discussed above, Marshall told police that she heard two gunshots as she entered the Little Canfield apartment complex, and she perceived the second shot as a warning shot directed at her. She saw Edmon holding a gun, and she fired at him once over her shoulder as she turned and ducked for cover. She said that Taylor then fired multiple shots at her, and she fired back at him. There was no evidence that she shot Taylor. Marshall also relies on the testimony of a witness who saw a man

20

limping followed by a tall woman with dyed blond hair carrying a gun. Marshall argues that this woman carrying a gun could have been a third assailant.

The jury charge instructed that Marshall's use of deadly force would be justified if she reasonably believed it was immediately necessary to protect herself from Edmon's use or attempted use of deadly force:

> If you find from the evidence beyond a reasonable doubt that the defendant, Letousha Marshall, did shoot Samuel Earl Edmon with a firearm, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words and conduct of Samuel Earl Edmon it reasonably appeared to the defendant that her life or person was in danger and there was created in her mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Samuel Earl Edmon, and that it was immediately necessary to protect herself against Samuel Earl Edmon's use or attempted use of unlawful deadly force, she shot Samuel Earl Edmon, then you should acquit the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under the circumstances, then you should give the defendant the benefit of that doubt and say by your verdict, not guilty.

Marshall contends that this charge was erroneous because it did not instruct the jury that Marshall's use of deadly force against Edmon would be justified in response to deadly force by Taylor or another unidentified person. The State does not dispute that the omission of multiple-assailants instructions was error. Accordingly, we assume without deciding that the omission constituted error.

To determine whether the error caused egregious harm, we consider (1) the entire jury charge; (2) the state of the evidence, including the contested issues and

21

the weight of the probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Alcoser*, 663 S.W.3d at 165.

Marshall first argues that the application portion of the charge contained run-on sentences and was "all but unreadable 'argle-bargle.'" We disagree. The application portion of the charge is about two pages long. While Marshall correctly notes that this portion contained lengthy run-on sentences, it appears this was necessary to apply the various facts indicating that Marshall may have acted in self-defense. The application paragraphs are not like the lengthy application paragraphs that the Court of Criminal Appeals found incomprehensible in *Reeves v. State*, 420 S.W.3d 812, 817–19 (Tex. Crim. App. 2013) (concluding that challenged provocation instruction was erroneous and buried within self-defense instruction that was "a six-page impenetrable forest of legal 'argle bargle'") (quotation omitted).

As the State points out, the charge also instructed the jury that:

- it "may consider all relevant facts and circumstances surrounding the death" of Edmon;

- a "reasonable belief" in the context of self-defense "meant a belief that would be held by an ordinary and prudent person in the same circumstances as [Marshall]"; and

- "[a] person has a right to defend her life and person from apparent danger as fully and to the same extent as she would had the danger been real."

22

The State argues that these instructions "authorized the jury to consider Taylor's actions as part of the facts or circumstances" even if a multiple-assailants instruction was omitted from the charge. Marshall disagrees.

Marshall focuses her disagreement on the charge's failure to define "apparent danger," but she does not cite any authority requiring a jury charge to define this phrase. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain "appropriate citations to authorities"). Generally, definitions for terms that are not statutorily defined are not considered to be the law applicable to the case under article 36.14, and it is thus "generally impermissible for the trial court to define those terms in the jury instructions." *Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015). Jurors should be permitted to freely read undefined statutory language and give it any meaning which is acceptable in common parlance. *Id.* (quotation omitted). An exception to this rule exists for "terms which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a well-known common law meaning." *Id.* (quotations omitted).

The Penal Code does not provide a statutory definition for apparent danger. *See* TEX. PENAL CODE §§ 1.07(a), 9.01. "Apparent danger" is a common phrase composed of common terms that are well-known to lay persons, and neither party argues that the phrase is a legal term of art. *See Green*, 476 S.W.3d at 445. To the

23

extent any confusion existed about the meaning of the phrase, the charge's reference to "apparent danger" contrasted that phrase with "real" danger: "A person has a right to defend her life and person from apparent danger as fully and to the same extent as she would *had the danger been real*." (Emphasis added.) Thus, we conclude that the charge was not required to define apparent danger.

Marshall also argues that even if the meaning of "apparent danger" was clear to the jury, the application paragraphs improperly limited the apparent danger to Edmon's conduct. We agree that if the charge erroneously omitted multiple-assailants instructions, as the parties agree, then the error lay in omitting references at least to Taylor's conduct and perhaps to an unidentified third person's conduct. We therefore conclude that this factor weighs slightly in favor of finding harm.

Considering the state of the evidence and the argument of counsel, however, any harm from the omission of a multiple-assailants charge was minimal. The only evidence supporting Marshall's theory of self-defense was her statement to police and a witness's report of a blond woman carrying a gun. But in Marshall's statement, she said that she shot Edmon because she perceived a threat of danger from him alone. Marshall did not say that she perceived any threat of danger from Taylor or anyone else when she shot Edmon. *See Jordan*, 593 S.W.3d at 344 (stating that multiple-assailants charge is proper if evidence shows "defendant had a reasonable fear of serious bodily injury from a group of people acting together"). Moreover,

24

there is no evidence that Marshall believed Taylor or anyone else was encouraging, aiding, or advising Edmon when she shot him. *See id.* True, the undisputed evidence shows that Taylor shot at her at least once, but this was only after she shot Edmon, as Marshall claimed in her statement and both detectives testified at trial.

This case is distinguishable from *Jordan*, which Marshall relies on. There, Jordan and his friend went to visit Jordan's ex-girlfriend at a bar. *Id.* The ex-girlfriend was at the bar with four male companions. *Id.* The companions began acting aggressively towards Jordan as soon as he arrived, and the ex-girlfriend called him an "asshole." *Id.* Jordan and his friend decided to leave soon after they arrived, but the four companions and the ex-girlfriend followed Jordan into the parking lot. *Id.* Two of the companions assaulted Jordan and his friend. While wrestling with one of them, Jordan pulled out his firearm, fired three shots, and hit an attacker and the ex-girlfriend. *Id.* at 344–45. Jordan testified that he fired his gun out of fear for his and his friend's safety, they were being mobbed by multiple assailants, and he had no other alternative. *Id.* at 344. Under these facts, the Court of Criminal Appeals held that the trial court erred in refusing Jordan's request for a multiple-assailants instruction at his trial for deadly conduct. *Id.* at 342, 345–46. It did not matter whether the two people who were shot individually used deadly force against Jordan; rather, it mattered whether Jordan "had a reasonable apprehension of actual or

25

apparent danger from a group of assailants" that included the two people shot. *Id.* at 345.

Here, there is no evidence that Marshall had a reasonable apprehension of actual or apparent danger from a group of assailants when she shot Edmon. According to her statement, she apprehended danger from Edmon alone when she shot him.

Marshall also argues that the State did not present any evidence rebutting her defensive theory that she was shot at first and did not provoke the shooting. We rejected this argument above in determining that the evidence was legally sufficient to support the jury's refusal to find that Marshall acted in self-defense. To disprove self-defense, we do not consider "whether the State presented evidence which refuted appellant's self-defense testimony." *Braughton*, 569 S.W.3d at 609. Thus, the State was not required to present evidence rebutting Marshall's self-defense theory so long as the State proved its case beyond a reasonable doubt. *See id.* at 608–09. We have already determined that the State met its burden.

The argument of counsel likewise weighs against a finding of egregious harm. Marshall correctly points out that in her opening statement, defense counsel argued that Edmon "was at one end and Mr. Taylor was at the other end. She was pinned in on both ends." But the trial evidence showed that Marshall did not perceive any danger from Taylor until after she shot Edmon. In closing arguments, defense

26

counsel did not rely on a threat from Taylor or a third person to justify Marshall's shooting of Edmon. Indeed, defense counsel argued that "it's his [Edmon's] actions that caused this, not hers."

Neither party addresses any other record information that is relevant to this issue, and we are not aware of any such information. After considering the relevant factors, we conclude that Marshall has not established that the omission of an instruction and application paragraph on multiple assailants egregiously harmed her. Because Marshall's trial strategy relied only on Edmon's actions to justify the shooting, any error in omitting a multiple-assailants instruction did not affect the very basis of the case, deprive Marshall of a valuable right, or vitally affect a defensive theory. *See Alcoser*, 663 S.W.3d at 165. We therefore hold that any error was harmless.

We overrule Marshall's second issue.

## D.     Presumption of Reasonableness Instruction

In her third issue, Marshall contends that she was egregiously harmed by the omission of an instruction on the presumption of reasonableness that applies under certain circumstances when a person uses deadly force against another.

As discussed above, a person is justified in using deadly force against another when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful

27

deadly force or to prevent the other's imminent commission of certain crimes, like murder. TEX. PENAL CODE § 9.32(a)(2). As relevant here, a defendant is entitled to a presumption of reasonableness in her belief that deadly force was immediately necessary under certain circumstances:

> The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:
>
> (1)    knew or had reason to believe that the person against whom the deadly force was used:
>
> \*\*\*\*
>
>     (C)    was committing or attempting to commit an offense described by Subsection (a)(2)(B) [which includes murder];
>
> (2)    did not provoke the person against whom the force was used; and
>
> (3)    was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id.* § 9.32(b); *see id.* § 2.05(b) (providing consequences of presumption favorable to defendant).

Marshall argues that she was entitled to an instruction on the presumption of reasonableness. The State disagrees, arguing that Marshall was engaged in disqualifying criminal activity at the time she used deadly force against Edmon. *See id.* § 9.32(b)(3). Specifically, the State asserts that Marshall engaged in a Class A misdemeanor offense by carrying a handgun outside of premises she owns or

28

controls or inside of or directly en route to her vehicle or watercraft. Marshall does not respond to this argument in her reply brief.

In October 2018 when Marshall shot Edmon, Penal Code section 46.02(a) provided:

> A person commits an offense if the person:
>
> (1) intentionally, knowingly, or recklessly carries on or about his or her person a handgun or club; and
>
> (2) is not:
>
>> (A) on the person's own premises or premises under the person's control; or
>>
>> (B) inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control.

Act of May 24, 2017, 85th Leg., 1st C.S., ch. 1049, § 4, sec. 46.02, Tex. Gen. Laws 4106, 4107 (amended 2019) (current version at TEX. PENAL CODE § 46.02(a)). This offense was classified as a Class A misdemeanor. *Id.*

As the State points out, Marshall conceded that she was carrying a firearm on her person when the shooting occurred, and she did not live at the Little Canfield apartments where Edmon was shot. *See id.* Moreover, she was on foot arriving to the apartment complex when the shooting occurred; there is no evidence that she was inside of or en route to her vehicle or watercraft. *See id.* Thus, by carrying a firearm at the time under these circumstances, Marshall was engaged in criminal activity that constituted a Class A misdemeanor. *See id.* § 9.32(b)(3) (providing that

presumption applies unless defendant was engaged in criminal activity other than Class C misdemeanor concerning traffic violation when she used deadly force). Marshall was therefore not entitled to an instruction on the presumption of reasonableness. We hold that the trial court did not err by omitting a charge on the presumption of reasonableness.

We overrule Marshall's third issue.

## E.     Self-Defense Application Instructions

In her fourth issue, Marshall contends that the jury charge erroneously instructed the jury that it "should" acquit her if it found she acted in self-defense rather than that it "must" so acquit her.

The application portion of the jury charge provided:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 10th day of October, 2018, in Harris County, Texas, the defendant, Letousha Marshall, did then and there unlawfully, intentionally or knowingly cause the death of Samuel Earl Edmon, by shooting Samuel Earl Edmon with a deadly weapon, namely, a firearm; or

If you find from the evidence beyond a reasonable doubt that on or about the 10th day of October, 2018, in Harris County, Texas, the defendant, Letousha Marshall, did then and there unlawfully intend to cause serious bodily injury to Samuel Earl Edmon, and did cause the death of Samuel Earl Edmon by intentionally or knowingly committing an act clearly dangerous to human life, namely, by shooting Samuel Earl Edmon with a deadly weapon, namely, a firearm, then you will find the defendant guilty of murder, as charged in the indictment, unless you so find from the evidence the defendant was justified in her conduct based on the law of self-defense, or if you have a reasonable doubt

thereof, you will acquit the defendant and say by your verdict "Not Guilty."

If you find from the evidence beyond a reasonable doubt that the defendant, Letousha Marshall, did shoot Samuel Earl Edmon with a firearm, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words and conduct of Samuel Earl Edmon it reasonably appeared to the defendant that her life or person was in danger and there was created in her mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Samuel Earl Edmon, and that it was immediately necessary to protect herself against Samuel Earl Edmon's use or attempted use of unlawful deadly force, she shot Samuel Earl Edmon, *then you should acquit* the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under the circumstances, *then you should give the defendant the benefit of that doubt* and say by your verdict, not guilty.

If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that she was in danger of death or serious bodily injury, or that the defendant, under the circumstances as viewed by her from her standpoint at the time, did not reasonably believe that the degree of force actually used by her was immediately necessary to protect herself against Samuel Earl Edmon's use or attempted use of unlawful deadly force, then you should find against the defendant on the issue of self-defense, and say by your verdict guilty.

(Emphasis added.)

Marshall complains about the italicized statements in the penultimate paragraph of this quoted portion of the charge. She argues that "should" is permissive rather than mandatory, and thus the jury may have decided not to acquit her even if it believed that she was justified in shooting Edmon in self-defense.

We agree with Marshall that a proper instruction required the jury to acquit her if it found in her favor on the self-defense issue. *See* TEX. PENAL CODE § 2.03(d) ("If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted."); *Ryser v. State*, 453 S.W.3d 17, 32 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("[T]he trial court was required to include in the charge an instruction that the jury must acquit Ryser if it has a reasonable doubt concerning *his* justification defense[.]"). But we disagree that the charge was erroneous.

First, Marshall focuses on a single word used twice in the middle of the application paragraph. In reviewing for charge error, however, we consider the charge as a whole rather than as a series of isolated and unrelated statements. *Dinkins*, 894 S.W.2d at 339. While it is true that the paragraph Marshall focuses on sets forth conditions under which the jury "should acquit" her or "should" give her the benefit of the doubt, Marshall's argument does not consider the application paragraphs as a whole.

The first two application paragraphs—which Marshall does not challenge— set out the charged offense of murder and provide that if the jury finds the evidence established these elements beyond a reasonable doubt, "then you *will* find the defendant guilty of murder . . . unless you so find from the evidence the defendant was justified in her conduct based on the law of self-defense, or if you have a

32

reasonable doubt thereof, you *will acquit* the defendant and say by your verdict 'Not Guilty.'" (Emphasis added.) These first two paragraphs state the ultimate circumstances under which the jury "will" find Marshall guilty or "will acquit" her. Marshall does not argue that "will" in this context is permissive.

The application paragraphs continued by providing various facts for the jury to consider in determining whether it "should" find for or against Marshall on the self-defense issue. Marshall challenges the part of these paragraphs stating that if the jury finds that certain facts exist, the jury "should" find in her favor on the defensive issue. But these paragraphs only stated additional facts concerning the self-defense issue. The first two application paragraphs, by contrast, set forth generally that if the jury found Marshall was justified in her conduct under the law of self-defense, it "will acquit" her. Under these circumstances, we are not persuaded that any rational jury would conclude that in context, "should acquit" permissively allowed a finding of guilt even if the jury found that she was justified in using deadly force.

This conclusion is reinforced by the charge's use of "should" in the final paragraph. This paragraph instructed that the jury "should find against the defendant on the issue of self-defense" if it found from the evidence beyond a reasonable doubt that Marshall was not justified in using self-defense. No rational jury could have construed this language as allowing discretion to acquit Marshall even if it found

33

that the evidence established the essential elements of murder beyond a reasonable doubt and that the evidence negated self-defense beyond a reasonable doubt.

Second, Marshall has not established that "should" is permissive. Our prior analysis supports the conclusion that "should" was not permissive in the context of the jury charge as a whole. Moreover, Marshall does not cite to any Texas decision that is directly on point,[5] and she acknowledges some conflicting decisions from the Seventh Circuit and two state appellate courts. Both the Seventh Circuit and a Georgia appellate court have held that a jury charge is not erroneous if it states that the jury should acquit a defendant. In *United States v. Ray*, the Seventh Circuit considered a charge similar to the one in this case. *See* 238 F.3d 828, 834 (7th Cir. 2001). Relying on its own precedent, the court concluded that while "must" is preferable, "should" did not constitute plain error:

> "Must" is preferable; but it is hardly plausible that the jury supposed that while they "should" acquit [the defendant] if he was not guilty beyond a reasonable doubt, they didn't have to acquit him if they didn't want to. Juries know better than that. We add that the judge also said that the jury "should," not "must," convict [the defendant] if they found that he was guilty beyond a reasonable doubt. In context, "should" was imperative—not hortatory—throughout the instruction.

---

[5] Marshall cites to a decision from the Fourteenth Court of Appeals holding that the trial court erred by omitting an instruction that made a mandatory presumption permissive. *See Webber v. State*, 29 S.W.3d 226, 230–31 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). This decision is inapposite because it does not address the issue presented here: whether "should" is permissive or mandatory in the context of the self-defense instructions.

*Id.* at 835 (quoting *United States v. Kerley*, 838 F.2d 932, 940 (7th Cir. 1988)). And the Georgia court rejected a similar challenge because "the words 'should acquit' are the language of command." *Parks v. State*, 695 S.E.2d 704, 708 (Ga. Ct. App. 2010) (quotation omitted).

A Washington appellate court, however, reached the opposite conclusion and held that "should acquit" language constituted error. *State v. Smith*, 298 P.3d 785, 791 (Wash. Ct. App. 2013). The court noted other decisions with conflicting holdings about whether "should acquit" language in a jury charge was error, as well as dictionary definitions and legal interpretations of the term "should" indicating that it "is a slightly weaker word" than "ought" and "expresses mere appropriateness, suitability, or fittingness." *Id.* at 790 (quoting BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 644 (3d ed. 2011)). The court "suspect[ed] that in this case the jury more likely than not understood the court's use of 'should' in the elements instruction as mandatory," but the court could not be sure that the jury did so because it was deadlocked at one point, and the record did not indicate how the deadlock was resolved. *Id.* at 790–91. The court speculated that "[p]erhaps jurors concluded from the court's instructions that while jurors with lingering doubts *should* return a verdict of not guilty, they did not have to." *Id.* at 791.

The charge in this case is distinguishable from that in *Smith*. As discussed above, the charge here instructed the jury that it "will acquit" Marshall if it finds that

she was justified in using deadly force in self-defense. Moreover, there is no indication here—such as a deadlocked jury—that might raise an inference that the jury interpreted "should acquit" as a permissive suggestion. To the contrary, "[i]n context, 'should' was imperative—not hortatory—throughout the instruction." *See Ray*, 238 F.3d at 835 (quotation omitted).

As the State points out, the Court of Criminal Appeals has used "must" and "should" interchangeably in discussing charges concerning acquittal. In *Alcoser*, the court stated that a jury charge must inform the jury "under what circumstances they should convict, or under what circumstances they should acquit[.]" 663 S.W.3d at 165 (quotation omitted). The *Alcoser* court also stated that "[w]hen self-defense is law applicable to the case, the trial court must inform the jury under what circumstances it should acquit a defendant of an offense based on self-defense." *Id.* at 169. In *Jordan*, the court stated that an application paragraph instructing the jury that it "should acquit the defendant on the grounds of self-defense" and "should give the defendant the benefit of [the] doubt" would authorize an acquittal if multiple assailants had not been raised. 593 S.W.3d at 347 & n.2; *see also State v. Sciacca*, 518 S.W.3d 460, 466 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (noting with approval that application paragraph on self-defense instruction "specifically told the jury that it should acquit Sciacca if it found that her exhibition of a deadly weapon was justified").

36

Marshall also relies on definitions of "should" from urbandictionary.com, arguing that the website "provides laypeople's usages and meanings of words and phrases." According to Marshall, the website defines "should" as: "When you say someone has the ability to do something, and it would be advantageous to do so; they should"; "A word used to describe something that could happen but likely will never due to a standard lack of caring, ethics, or general sense"; and "Like could, only replace the c with a sh." We decline Marshall's invitation to rely on urbandictionary.com in this case.

Marshall offers no support for her contention that the website "provides laypeople's usages and meanings of words and phrases." She cites to the website itself for this argument, but the website does not say this. But even if Marshall were correct, there is no evidence that the jury relied on the website to define a common word like "should." Moreover, our research reveals that Texas courts only cite the website to define slang words not found in other dictionaries. *E.g.*, *Hart v. State*, 688 S.W.3d 883, 889 & n.3 (Tex. Crim. App. 2024) (defining "trap king"); *Rotter v. State*, No. 02-23-00325-CR, 2025 WL 937496, at *1 & n.1 (Tex. App.—Fort Worth Mar. 27, 2025, no pet.) (mem. op., not designated for publication) (defining "merk").

37

"Should" is a common term, not a slang term. Other dictionaries provide similar definitions that are more reliable under the facts of this case.[6]

We conclude that the charge was not erroneous for using "should" in the application paragraphs under the facts presented here. Although "must" may be a preferable term, in the context of the jury charge as a whole, any rational jury would have concluded that isolated references to "should acquit"—paired with "will acquit" references—were mandatory commands, not permissive suggestions. We hold that the application paragraphs were not erroneous.

We overrule Marshall's fourth issue.

## F.     Cumulative Error

In her fifth issue, Marshall asserts that the cumulative effect of the multiple jury charge errors discussed above rendered her trial fundamentally unfair.

Multiple errors may be harmful in their cumulative effect. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009). However, the Court of Criminal Appeals has "never found that 'non-errors may in their cumulative effect cause error.'" *Id.* (quoting *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App.

---

[6]     *E.g.*,     *Should*,     Merriam-webster.com,     https://www.merriam-webster.com/dictionary/should (last visited June 6, 2025) (defining "should" to include "past tense of shall"; "to express obligation, propriety, or expediency"; "to express condition"; and "to express what is probable or expected"); *Should*, Dictionary.com, https://www.dictionary.com/browse/should (last visited June 6, 2025) (defining "should" to include "must; ought (used to indicate duty, propriety, or expediency)"; "simple past tense of shall"; and "to express a future potential event or condition").

38

1999)); *see also Jenkins v. State*, 493 S.W.3d 583, 613 (Tex. Crim. App. 2016) (stating that where appellant failed to show error, "there is no error to cumulate").

We have already found little to no error in Marshall's challenges to the jury charge. Although we assumed without deciding that the charge erroneously omitted instructions on multiple assailants, we did so only because the State did not dispute that error existed, and we ultimately concluded that any error from the omission was harmless. Thus, we did not find cumulative error, and we also do not find cumulative harm. We hold that Marshall's cumulative error issue lacks merit.

We overrule Marshall's fifth issue.

## Conclusion

We affirm the trial court's judgment of conviction.

David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).